**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JEROME T. DUNBAR, | |
|     Plaintiff, | No. 3:16-cv-01823 (MPS) |
|     v. | |
| DAVID AVIGDOR, *et al.*, | |
|     Defendants. | February 11, 2020 |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Jerome T. Dunbar, *pro se*, brought this action against his prior landlords and members of the New Haven Police Department, asserting federal and state law claims arising from an inspection of his apartment on November 4, 2013. Defendants Dean Esserman, V. Herrera, Anthony Campbell, David K. Runlett, Anthony Duff, and R. Davis (the "Police Defendants") moved for summary judgment on all claims against them on March 25, 2019. ECF No. 123. Defendants David Avigdor, Susanne Avigdor, and 1630 Chapel, LLC (the "Private Defendants") filed their own motion for summary judgment on claims against them on March 26, 2019. ECF No. 126. For the reasons set forth below, I grant summary judgment to the Police Defendants on all federal law claims asserted against them, both individually and in their official capacities, and I decline to exercise supplemental jurisdiction over the remaining state law claims.

## I.    BACKGROUND

Mr. Dunbar first filed this action in November 2016 and filed the operative amended complaint, ECF No. 67, in May 2018. The Court assumes familiarity with the procedural history of this case.

1

In his amended complaint, ECF No. 67, Mr. Dunbar pleads seven counts against the defendants.[1] Against the Private Defendants, his landlords, he alleges negligent infliction of emotional distress (Count One) and intentional infliction of emotional distress (Count Two). *Id.* at 2–4. Against the Police Defendants, he alleges the same state law claims as well as unreasonable search (Count Three) and use of excessive force (Count Four) in violation of the Fourth Amendment, retaliation (Count Five), failure to train and failure to supervise (Count Six), and failure to intercede (Count Seven). *Id.* at 2–7. Mr. Dunbar states that he is suing each Police Defendant in both his individual and official capacities.[2] *Id.* at 2.

The defendants' motions for summary judgment both included a notice to pro se litigants, as required by Local Rule 56(b). ECF No. 123-3; ECF No. 127. Mr. Dunbar has filed no response to the motions.[3]

---

[1] Mr. Dunbar's amended complaint also names David Shancupp as a defendant, but Mr. Dunbar voluntarily dismissed his claims against Shancupp on May 8, 2018. ECF No. 70.

[2] Although Mr. Dunbar has proceeded *pro se* for most of the case, his operative complaint was drafted by pro bono counsel appointed from the Court's list of pro bono civil attorneys. I directed the Clerk to appoint counsel "for the limited purpose[] of . . . drafting a clear, coherent complaint." *See* ECF No. 59. Thus, while the liberal rules applicable to the interpretation of *pro se* pleadings apply to most of Mr. Dunbar's filings in this case, they do not apply to his amended complaint, ECF No. 67.

[3] In a March 28, 2019 Order, the Court reminded Mr. Dunbar that he must respond to the two motions for summary judgment by April 15, 2019 and April 16, 2019 respectively. ECF No. 130. Upon Mr. Dunbar's motion, the Court granted an extension until April 30, 2019 to respond, and warned that "[t]he Court will not extend this deadline further. If the Plaintiff does not file his response to the motions for summary judgment by April 30, 2019, the Court will review the motions without his response." ECF No. 134. Mr. Dunbar sought another extension on April 30, which the Court denied since Mr. Dunbar "d[id] not explain why the Court should reconsider its previous order, nor does he explain why he failed to request an extension until 11:57 PM on the day of the deadline." ECF No. 141. During this period, Mr. Dunbar filed seven other motions with the Court, not including his last-minute, second motion for an extension of time on April 20, 2019. *See* ECF Nos. 128–29, 131–33, 137–38.

## II.     FACTS

The following facts are taken from the Police Defendants' Local Rule 56(a)1 Statement of Undisputed Material Facts ("56(a)1 Statement."), ECF No. 123-2, and from the record, including Mr. Dunbar's deposition testimony.[4] Because Mr. Dunbar did not respond to any of the defendants' summary judgment papers, despite receiving adequate notice of the motions and a reminder from the Court, I deem all the facts in the Defendants' 56(a)1 Statement admitted. Fed. R. Civ. P. 56(e)(2); D. Conn. L. Civ. R. 56(a)1 ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted . . . unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party . . . .").

Mr. Dunbar was a tenant of Defendants David Avigdor, Susanne Avigdor, and 1630 Chapel LLC from December 1, 2011 until November 25, 2014, residing in the third-floor apartment at 1630 Chapel Street, New Haven, Connecticut. 56(a)1 Stmt., ECF No. 123-2 ¶ 1 (citing Am. Compl., ECF No. 67 ¶¶ 15, 19). On November 4, 2013, David Avigdor called the New Haven Police Department to request assistance with an inspection of the apartment. *Id.* ¶ 19; Ex. C, ECF No. 125 (audio recording of telephone call). Mr. Avigdor reported that he had "a recalcitrant tenant whom the landlords were trying to evict, and who was aware of a scheduled inspection on that date." 56(a)1 Stmt., ECF No. 123-2 ¶ 20. He also reported that there were "a lot of bad feelings," that the tenant "had bolted some doors," and that there had been "some problems on the property." *Id.* ¶¶ 20–21; Ex. C, ECF No. 125. Mr. Avigdor stated that he wanted

---

[4] The Private Defendants also submitted a Local Rule 56(a)1 Statement, ECF No. 124-1, which is nearly identical to the statement submitted by the Police Defendants.

a police escort because "we don't wanna have any violence" and "we don't wanna have any trouble." Ex C, ECF No. 125.

Around 9:00 AM, Officers Runlett and Herrera were dispatched to 1630 Chapel Street; when they arrived, they spoke with Mr. Avigdor, who told them he had sent a notice of inspection to Mr. Dunbar. 56(a)1 Stmt., ECF No. 123-2 ¶¶ 22–23. Mr. Dunbar later acknowledged that he had received the notice. *Id.* ¶ 24; Dunbar Dep., ECF No. 123-2 at 58. Mr. Avigdor told the officers he was "going through the eviction process with Jerome Dunbar . . . and that [h]e believed that Dunbar had changed the lock on the back door of his apartment as well as possibly boarding the front door shut, denying access and creating a fire/public hazard." 56(a)1 Stmt., ECF No. 123-2 ¶ 25.

David and Suzanne Avigdor led the officers to the rear door of Mr. Dunbar's apartment, and Suzanne Avigdor "attempted to access the third-floor apartment with a key, but was unsuccessful." *Id.* ¶¶ 26–27. Officer Runlett "knocked loudly on the door, announcing their presence, and heard footsteps coming down the stairs." *Id.* ¶ 28. Officer Runlett "took out his department-issued Taserx26 for Officer safety" since he did not know "whether the plaintiff was armed, psychotic, or emotionally disturbed, based on the information provided to them." *Id.* ¶ 28. Mr. Dunbar opened the door, and Officer Runlett "pointed his taser at the plaintiff, who asked why the police were there." *Id.* ¶ 29. Officer Runlett "explained that they were there with the landlords to do an inspection," and holstered his taser because he "felt that there was no threat." *Id.* ¶¶ 29-30; Case Incident Report, ECF No. 123-2 at 80. Inside the apartment, the officers observed that the front door was not barricaded or boarded shut; Officer Runlett did "observe[] a screw hole in the door jamb, but [] there was no longer a screw in place in the hole." 56(a)1

Stmt., ECF No. 123-2 ¶ 31. Mr. Dunbar admitted that he had changed the lock on the rear door. *Id.* ¶¶ 32–33; Dunbar Dep., ECF No. 123-2 at 31.

At his deposition, Mr. Dunbar gave a somewhat different account of the November 4, 2013 incident. He describes hearing the police knock on the back door to his apartment and announce themselves as "New Haven Police." Dunbar Dep., ECF No. 123-2 at 24, 26. He answered the door, and the officer was holding a taser. *Id.* at 26. Mr. Dunbar testified, "I believe – I'm not certain – I asked him why he was there; 'We're here to do' – I don't know if he said, 'We're here to do an inspection,' but he told me that the [front] door was barricaded, something about the door being barricaded, and I just replied, 'There's no door barricaded.'" *Id.* About 20 seconds after opening the door, Mr. Dunbar asked the officers, "Do you want me to show you [the front door]?" *Id.* Mr. Dunbar led the officers up the stairs from the back door, past a room where his radio was playing, and down the front stairs to the front door. *Id.* at 26–28. He testified that the officer kept the taser pointed at him this whole time. *Id.* at 27 ("I didn't want to get tased, going to turn the radio down, and he's got the taser right on me."); *id.* at 28 ("I'm going down the stairs in the front; he's still got the taser at the top, pointed at me."). When Mr. Dunbar reached his front door, he unlocked the door and said, "See; I told you it wasn't barricaded." *Id.* at 29. The officer holstered his taser at that point, "said 'I want to go home,' or 'Everyone wants to go home at night' . . . something to that effect," and then had a brief conversation with Mr. Avigdor. *Id.* Mr. Dunbar estimates that the taser was pointed at him for a total of "one minute, 45 seconds, to two minutes." *Id.* at 42.

A few weeks after this inspection, on November 26, 2013, Mr. Dunbar filed a Civilian Complaint with the New Haven Police Department's Internal Values and Ethics Division, alleging that Officer Runlett kept his taser pointed at Mr. Dunbar "as he followed him through

the apartment to the front door." *Id.* ¶¶ 34–35; Internal Affairs Compl., ECF No. 123-2 at 74–78. Roy Davis, then a Sergeant with the New Haven Police Department, investigated Mr. Dunbar's complaint and interviewed him on December 27, 2013. 56(a)1 Stmt., ECF No. 123-2 ¶ 38. Following the interview, review of the file, and an internal investigation, Sergeant Davis "concluded that the case should be closed as exonerated, finding no violations of policy, laws, or procedure." *Id.* ¶ 39; Davis Memo, ECF No. 123-2 at 72–73. Mr. Dunbar suggested to the Police Department that "he may have audio or video evidence" of the November 4, 2013 inspection. 56(a)1 Stmt., ECF No. 123-2 ¶ 41. Sergeant Davis told Mr. Dunbar he would review such evidence if submitted and would "continue with the investigation if the evidence warranted such action." *Id.* ¶ 41; Davis Memo, ECF No. 123-2 at 73. A member of the New Haven Civilian Review Board also reviewed Mr. Dunbar's file and "concluded that there was no evidence that the officer used undue force." 56(a)1 Stmt., ECF No. 123-2 ¶ 42; CRB Review, ECF No. 123-2 at 91.

Nearly three years later, on November 8, 2016, Mr. Dunbar contacted the New Haven Police Department Internal Affairs unit and "requested a letter reflecting the outcome of his 2013 complaint." 56(a)1 Stmt., ECF No. 123-2 ¶ 43. The Internal Affairs unit sent him such a letter on November 10, 2016. Cain Letter, ECF No. 123-2 at 67. In July 2017, Mr. Dunbar again requested "a copy of the disposition of his 2013 complaint" from the New Haven Police Department. 56(a)1 Stmt., ECF No. 123-2 ¶ 49. Anthony Duff, the Officer in Charge of Internal Affairs at the time, mailed Mr. Dunbar another letter summarizing the 2013 complaint and investigation. *Id.* ¶ 50; Duff Letter, ECF No. 123-2 at 64–65.

## III.    LEGAL STANDARD

The court must grant a motion for summary judgment if the moving party shows "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* In reviewing the record, the court "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013).

## IV.    DISCUSSION

The amended complaint asserts federal causes of action against the Police Defendants. I turn first to these claims and grant summary judgment to the defendants on each one.

### A.  Unreasonable Search (Count Three)

Mr. Dunbar claims that Officers Runlett and Herrera conducted a warrantless search of his apartment without probable cause and without his consent, in violation of the Fourth

Amendment. Am. Compl., ECF No. 67 ¶¶ 37–40.[5] The defendants argue that Mr. Dunbar had no

reasonable expectation of privacy under the circumstances, since Connecticut law permits

landlords to inspect rental units if notice is given to tenants, and that Mr. Avigdor consented to

the officers' inspection. Defs.' Br., ECF No. 123-1 at 17–19. The defendants also quote caselaw

noting that warrantless searches are lawful "when a person with authority to do so has freely

consented." *Id.* at 18 (citing *State v. Martinez*, 49 Conn. App. 738, 743 (1998)). The defendants

also argue that the claim against Officer Herrera is time-barred, *id.* at 16, and that Officer Runlett

is entitled to qualified immunity, *id.* at 20–23.

It is undisputed that Officers Runlett and Herrera entered Mr. Dunbar's apartment

without a warrant. A warrantless entry does not violate the Fourth Amendment, however, if the

occupant consents and if the ensuing search does not exceed the scope of the consent. *Florida v.

Jimeno*, 500 U.S. 248, 250–51 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

"The standard for measuring the scope of a [subject's] consent under the Fourth Amendment is

that of 'objective' reasonableness—what would the typical reasonable person have understood

by the exchange between the officer and the [subject]?" *Jimeno*, 500 U.S. at 251. In addition, the

Government must show that consent was "voluntarily given, and not the result of duress or

coercion, express or implied," but the Government need not prove that the subject had

"knowledge of a right to refuse." *Schneckloth*, 412 U.S. at 248–49. Courts in the Second Circuit

look to a number of factors to determine whether consent was voluntary, including the "age,

education, [and] intelligence" of the subject, the "length of detention, use of physical

punishments or deprivations, and whether the alleged consenting person was advised of his

---

[5] The title of Count Three refers to "Unreasonable Searches and Seizures," but there is no
allegation or evidence that the Police Defendants seized any property while in the apartment.

constitutional rights," whether the subject was in custody, whether guns were drawn, whether the subject was frisked or threatened, whether he was in a public area, and whether he was "informed that he had the option of refusing consent." *United States v. Puglisi*, 790 F.2d 240, 243–44 (2d Cir. 1986). Whether consent was voluntary is a question to be determined "from the totality of all the circumstances," *Schneckloth*, 412 U.S. at 227, using a "fact-specific . . . reasonableness inquiry," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

At the summary judgment stage, the qualified immunity analysis involves two questions: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Cugini*, 941 F.3d at 611. District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A defendant police officer "is entitled to qualified immunity from a Fourth Amendment claim against him on a motion for summary judgment" where "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of defendant's conduct under the circumstances" *Cugini*, 941 F.3d at 615 (internal quotation marks and alterations omitted).

The undisputed evidence in this case shows that Mr. Dunbar voluntarily consented to the officers' entering his apartment; or at the very least, reasonable officers could disagree about whether Officers Runlett and Herrera acted within the Fourth Amendment. "Consent may be express or implied," *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018), and Mr. Dunbar's actions implied consent to the officers' entering his apartment. Mr. Dunbar admitted at his deposition that he was expecting an inspection that morning and opened the door for the

officers after they knocked and announced themselves. Dunbar Dep., ECF No. 123-2 at 58, 24, 26; Civilian Complaint of Misconduct, ECF No. 123-2 at 75 ("I received notification of an inspection to be performed by Suzanne and or David Avigdor on behalf of 1630 Chapel LLC the owner of the apartment."). When the police indicated that they were there to see if the front door was barricaded, Mr. Dunbar said, "There's no door barricaded" and asked, "Do you want me to show you?," suggesting that he was inviting the officers to enter the apartment. Dunbar Dep., ECF No. 123-2 at 26. He led the officers up the stairs from the back door, through the apartment, and to the front door, to show them it was not barricaded. *Id.* at 26–29; *id.* at 29 ("See; I told you it wasn't barricaded."). Neither Mr. Dunbar's testimony nor any other evidence in the record suggests that he ever suggested to the officers that they could not enter, ever showed any signs of opposing their entry, or ever asked them to leave.

To be sure, Mr. Dunbar's testimony—which I credit for the purposes of this ruling—that Officer Runlett was pointing a taser at him before entering the apartment and during the walk-through of the apartment raises a question about whether Mr. Dunbar's consent was voluntary, "rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993), *cert. denied*, 511 U.S. 1025 (1994). But the fact that an officer pointed a taser at him does not, by itself, render the consent involuntary. *See United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004)*, abrogated in part on other grounds* (finding voluntary consent to search since "[t]he fact that police drew their guns to effectuate the arrest does not necessarily establish coercion"); *United States v. Miley*, 513 F.2d 1191, 1204 (2d Cir. 1975) (approving finding of voluntary consent to search when "weapons were drawn by a few agents only as a precaution during entry of the apartment"); *United States v. Zubiate*, No. 08-CR-507, 2009 WL 483199, at *6 (E.D.N.Y. Feb. 25, 2009) (finding that defendant voluntarily consented to search where

officers "had their weapons drawn only as a precaution when entering the premises, and there is no evidence that either used his gun in a manner that coerced [defendant] to consent to a search of the apartment"); *Levy v. Kick*, No. 3:06CV390, 2007 WL 2492036, at \*7 (D. Conn. Aug. 30, 2007) ("There must be additional information besides the fact that the officer was wearing a uniform, badge, and gun to show that the consent was involuntary."). Courts have held that defendants voluntarily consented to searches in considerably more coercive situations than the one here. *See, e.g.*, *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (upholding finding that defendant voluntarily consented to search after being arrested and forced to the ground at gunpoint and invoking the right to remain silent); *United States v. Ceballos*, 812 F.2d 42, 51 (2d Cir. 1987) (holding that defendant voluntarily consented despite having been taken in handcuffs to a Secret Service field office and questioned for "a couple of hours").

Here, though Officer Runlett was holding a taser, the totality of the circumstances shows that Mr. Dunbar's consent was voluntary and not coerced. The two officers were accompanied by Mr. Dunbar's landlord when they appeared at his door. Mr. Dunbar had received notice of an inspection, and, under Connecticut law, he could not unreasonably withhold his consent to an inspection by his landlord where, as here, the landlord provided reasonable notice. Conn. Gen. Stat. § 47a-16(a), (c). He testified that he was expecting an inspection that morning, and the presence of his landlord would have made clear that the officers were there for that purpose. The officers did not arrest or threaten to arrest Mr. Dunbar, threaten to search his home regardless of his consent, raise their voices, or otherwise seek to intimidate him to gain entry. Mr. Dunbar told Defendant Davis that "at no point was there a red dot on his person," indicating that Officer Runlett had unholstered the taser but never turned it on. Davis Memo, ECF No. 123-2 at 72. These facts distinguish this case from those where the court found consent was involuntary based

on coercive police action. *Compare, e.g.*, *United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973) (finding that Government did not prove voluntary consent where "five or six officers" broke down a woman's door at 2:00 AM, "entered her bedroom, with gun in hand, and announced to her that she was under arrest," told her they wanted a particular package, and she pointed to a closet).

Moreover, even if Mr. Dunbar did feel coerced, Officers Runlett and Herrera are entitled to qualified immunity because reasonable officers could disagree as to whether Mr. Dunbar voluntarily consented to the entry. Mr. Dunbar had a statutory obligation to refrain from unreasonably withholding his consent to a noticed inspection by his landlord, Conn. Gen. Stat. § 47a-16, and Mr. Avigdor told the officers that he had provided notice to Mr. Dunbar. Case Incident Report, ECF No. 123-2 at 80 ("David [Avigdor] advised that he sent a notice, which he showed us, advising the 3rd floor tenant, Jerome Dunbar[,] that the apartment would be inspected today."). This obligation, along with Mr. Dunbar's statements when he opened the door, ECF No. 123-2 at 26 ("There's no door barricaded" and "Do you want me to show you?"), would lead a reasonable officer to conclude that Mr. Dunbar consented to the officers' entering his apartment for an inspection. Mr. Dunbar also led the officers through his apartment and did not show any signs of opposing their entry or ever ask them to leave. Because, at the very least, reasonable officers could disagree as to the legality of Officer Runlett's and Officer Herrera's conduct, they are entitled to qualified immunity on the unlawful search claim.

In addition, I find that the officers limited their activities within the apartment to the scope of Mr. Dunbar's consent. There is no evidence that they rummaged through any rooms, opened any drawers or cabinets, or otherwise searched for anything. Rather, the undisputed evidence indicates that they simply walked through the apartment with Mr. Dunbar while he led

them to the front door. *See* Davis Memo, ECF No. 123-2 at 72 ("After I explained what a search was, Mr. Dunbar agreed that Officer Runlett did not search any part of his residence, but instead followed Mr. Dunbar from the rear of the residence to the front door . . . . Officer Runlett did not go into any room, closet, drawer, or anything else inside the apartment."); Dunbar Dep., ECF No. 123-2 at 30 (testifying that neither police officer followed Mr. Dunbar into the room with the radio). Mr. Dunbar consented to the officers' entering the apartment to see whether the front door was barricaded, and that is all the officers did. Therefore, the conduct of the officers in entering and walking through the apartment did not violate Mr. Dunbar's Fourth Amendment rights.

### B. Excessive Force (Count Four) and Failure to Intercede (Count Seven)

Mr. Dunbar's amended complaint also alleges that Officer Runlett used excessive force by "point[ing] his taser at Mr. Dunbar without warning," in violation of the Fourth Amendment. ECF No. 67 ¶¶ 42–44. The Police Defendants argue that Officer Runlett's actions were not "objectively unreasonable," and that he is entitled to qualified immunity. ECF No. 123-1 at 13, 20. I agree.

Excessive force claims involving police conduct are "analyzed under the Fourth Amendment's reasonableness standard," requiring "careful attention to the facts and circumstances of each particular case" and objective analysis, "view[ing] officers' actions in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation or the 20/20 vision of hindsight." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (internal quotation marks omitted). Courts should "balance an individual's Fourth Amendment interests against countervailing governmental interests, including the severity of the crime and whether the suspect poses a safety or flight risk or resists arrest." *Id.* at 608.

In the Second Circuit, numerous cases hold that merely brandishing or pointing a gun, absent aggravating circumstances such as a death threat, does not constitute excessive force in violation of the Fourth Amendment. *See Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *15 (S.D.N.Y. Sept. 30, 2015) (collecting cases supporting proposition that "merely drawing" a weapon without firing it "does not constitute excessive force as a matter of law"); *Merrill v. Schell*, 279 F. Supp. 3d 438, 446 (W.D.N.Y. 2017) ("[T]he Second Circuit has never explicitly recognized an excessive-force claim in the absence of physical contact. . . . So threats alone, and brandishing weapons alone, do not clearly violate an arrestee's right."); *see also Hall v. McGhee*, 762 F. App'x 837, 845 (11th Cir. 2019) (finding no controlling caselaw in the Eleventh Circuit to put officers on notice that "pointing, pressing, and threatening the use of a taser" was excessive force); *Guilford v. Frost*, 269 F. Supp. 3d 816, 829 (W.D. Mich. 2017) (noting "[t]he Sixth Circuit has never found that pointing a taser, as opposed to actually discharging one, constitutes the use of excessive force"); *cf. Mills v. Fenger*, 216 F. App'x 7, 9–10 (2d Cir. 2006) (noting that a "gunpoint death threat issued to a restrained and unresisting arrestee" could constitute excessive force, but declining to make a finding of excessive force "given the lack of a factual predicate for the claim that the gun was pointed at [plaintiff's] head"); *Kramer v. City of Danbury,* No. 3:07CV01749, 2010 WL 11661294, at *9 (D. Conn. Jan. 22, 2010) (noting that a jury could find "that the placement of a taser on an individual's spine, along with the threat of inflicting '50,000 volts' is excessive when [the other officer] had already effectively restrained him and had him pinned against the wall").

At the very least, reasonable officers could disagree about whether Officer Runlett's pointing his taser at Mr. Dunbar complied with the Fourth Amendment under the circumstances. *See Cugini*, 941 F.3d at 615 (Qualified immunity applies where "the only conclusion a rational

jury could reach is that reasonable officers would disagree about the legality of defendant's conduct under the circumstances."). Before knocking on the door of Mr. Dunbar's apartment, Officers Runlett and Herrera were told that the Avigdors were embroiled in eviction litigation with Mr. Dunbar, that Mr. Avigdor wanted to access the apartment for an inspection and thought police assistance was necessary, that he had provided notice to Mr. Dunbar of the inspection, that he had repeatedly tried to contact Mr. Dunbar without success, and that he believed Mr. Dunbar had changed the lock on the back door and possibly barricaded the front door shut. 56(a)1 Stmt., ECF No. 123-2 ¶¶ 19–23, 25; Case Incident Report, ECF No. 123-2 at 80 (Officer Runlett's narrative describing that he and Officer Herrera were dispatched "regarding a landlord tenant dispute," that they "[w]ere advised by dispatch that the landlord needed to gain access to the 3rd floor apartment for inspection purposes," that David Avigdor "advised that he sent a notice," that Avigdor "is going through the eviction process with Jerome," that Avigdor had attempted to contact Mr. Dunbar "and was met with negative results," and that Avigdor "believed Jerome had changed the locks to the front door of his apartment as well as possibly boarding the door shut").[6] Officer Runlett observed Ms. Avigdor attempt unsuccessfully to open the back door with her key, indicating that Mr. Dunbar had indeed changed the locks. 56(a)1 Stmt., ECF No. 123-2 ¶ 27; Case Incident Report, ECF No. 123-2 at 80. Based on this information, expecting a recalcitrant tenant who had been hostile to the landlords and had possibly barricaded a door, Officer Runlett reasonably and prudently drew his taser to ensure his, Officer Herrera's, and the Avigdors' safety. *See* Case Incident Report, ECF No. 123-2 at 80 (explaining that he did not

---

[6] Mr. Avigdor had also told the police dispatcher that he was requesting a police escort because, "we don't wanna have any violence," and "there's a lot of bad feelings so we don't wanna have any trouble." Ex. C, ECF No. 125. But there is no evidence that the officers were aware of the specific contents of Mr. Avigdor's call with the dispatcher.

know whether Mr. Dunbar "or who[]ever was coming to open the door was arm[]ed, p[sy]chotic and[/]or emoti[o]nal[l]y disturbed based upon the information provided to us").

The Police Defendants aver that Officer Runlett pointed his taser at Mr. Dunbar when he opened the back door, but then holstered it when Mr. Dunbar indicated that he was expecting the inspection. 56(a)1 Stmt., ECF No. 123-2 ¶¶ 29–30; Case Incident Report, ECF No. 123-2 at 80. At his deposition, however, Mr. Dunbar testified that Officer Runlett continued pointing the taser at him for about 2 minutes, as they walked through the apartment to the front door. Dunbar Dep., ECF No. 123-2 at 42 (estimating total amount of time as "closer to one minute, 45 seconds, to two minutes, approximately"). Even crediting Mr. Dunbar's version of events for the purpose of this motion, I find that Officer Runlett is entitled to qualified immunity. At the least, it was not clearly established that pointing a taser at a subject for two minutes without using or threatening to use it constituted excessive force. Under all the circumstances, it was not unreasonable for Officer Runlett to wait to holster the taser until he had seen that the front door was not, in fact, barricaded, confirming that Mr. Dunbar was not hostile—or at least reasonable officers could disagree about the legality of Officer Runlett's conduct. There is no evidence that Officer Runlett engaged in any other intimidating conduct; he was not particularly close to Mr. Dunbar, *see* Dunbar Dep., ECF No. 123-2 at 26–27 (estimating he was about four feet away), did not threaten to use the taser, and did not even turn it on. Davis Memo, ECF No. 123-2 at 72 ("Mr. Dunbar stated that at no point was there a red dot on his person.").

Viewing the facts in the light most favorable to Mr. Dunbar, reasonable officers could disagree about the legality of Officer Runlett's pointing his taser at Mr. Dunbar for two minutes, and Officer Runlett did not violate any clearly established right. *Merrill*, 279 F. Supp. 3d at 446 ("[T]he Second Circuit has never explicitly recognized an excessive-force claim in the absence

of physical contact."). Therefore, I find that Officer Runlett has qualified immunity on the excessive force claim. For the same reasons, Officer Herrera has qualified immunity for failing to intercede. Am. Compl., ECF No. 67 ¶¶ 59–60.

## C. Retaliation (Count Five)

In Count Five, Mr. Dunbar alleges that Defendants Davis and Duff violated his First Amendment rights by refusing to investigate fully his police misconduct complaint in order "to retaliate against Mr. Dunbar for making the complaint." Am. Compl., ECF No. 67 ¶¶ 47–53. I construe these paragraphs as alleging a First Amendment retaliation claim, but I find that the evidence in the record does not support such a claim.

To establish a First Amendment retaliation claim, a plaintiff must prove: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). There is no evidence in the record suggesting that the defendants' actions were motivated or caused by Mr. Dunbar's making a police misconduct complaint. The evidence shows that Sergeant Davis sought to investigate Mr. Dunbar's complaint and pursued Mr. Dunbar for an interview even when Mr. Dunbar was initially unresponsive. *See* Davis Memo, ECF No. 123-2 at 72 (documenting attempts to interview Mr. Dunbar in December 2013); Case Activity Log, ECF No. 123-2 at 61 (same). Sergeant Davis did interview Mr. Dunbar twice, reviewed the Case Incident Report, invited him to submit additional video or audio evidence if he had it, and concluded that "Officer Runlett did not violate any department policy." *Id.* While a reasonable juror could perhaps conclude that Sergeant Davis's investigation was cursory, *see* Dunbar Dep., ECF No. 123-2 at 49 (alleging that Sergeant Davis "didn't even spend maybe five, ten minutes

with me"), there is no evidence that he failed to take critical investigative steps, ignored evidence, or reached his conclusion because Mr. Dunbar had filed a complaint or because of any retaliatory motive.

There is even less evidence in the record to support a claim of First Amendment retaliation against Defendant Duff. Officer Duff's only involvement in the process was answering a phone call from Mr. Dunbar in July 2017 concerning the disposition of his complaint and sending a letter stating that Officer Runlett was exonerated, along with a summary of the internal investigation. 56(a)1 Stmt., ECF No. 123-2 ¶¶ 49–51; Duff Letter, ECF No. 123-2 at 64–65. There is no indication in the record that Officer Duff "made a determination that Officer Runlett's actions were proper"; he simply responded to Mr. Dunbar's request for a copy of the "disposition" of his 2013 complaint. ECF No. 123-2 at 63 (note that Mr. Dunbar "called 7-7-17 – would like a copy of the disposition?").

Moreover, there is no evidence that either Sergeant Davis or Officer Duff effectively chilled the exercise of Mr. Dunbar's free speech rights. After he filed his complaint with the Police Department in 2013 and after Sergeant Davis's investigation and finding of exoneration, Mr. Dunbar filed this lawsuit on November 4, 2016, and contacted the Police Department regarding his complaint twice thereafter, on November 8, 2016 and in July 2017. *See Curley*, 268 F.3d at 73 ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his Frist Amendment right to free speech."). Mr. Dunbar's First Amendment rights were clearly not chilled by Sergeant Davis's or Officer Duff's actions.

Therefore, because the evidence viewed in the light most favorable to Mr. Dunbar does not support two of the three elements of a First Amendment retaliation claim, I grant summary judgment to the defendants on this count.

**D. Failure to Train and Supervise (Count Six)**

Mr. Dunbar's only claim against Defendant Esserman—former Chief of Police for New Haven—is an allegation of "failure to train and supervise [his] officers," causing Mr. Dunbar harm. Am. Compl., ECF No. 67 ¶¶ 55–57. This claim is pled in conclusory terms, stating that Chief Esserman "knowingly enforced a policy and practice" that permitted constitutional violations, and "failed to take corrective action," but not describing any particular policy, practice, or corrective action. *Id.* These allegations do not meet the requisite pleading standard because they do not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Even if his complaint did state a claim, Mr. Dunbar effectively admitted at his deposition that he had no evidence to support this claim and that there is none in the record. Dunbar Dep., ECF No. 123-2 at 43–44 (When asked what evidence supported his claim against Chief Esserman, Mr. Dunbar responded, "Now, I would refer to my complaint, because the complaint outlines that, and as I sit here, I can't adequately . . . go into the memorandum of law and what it was based on . . . . I think it's by enforcing the policy that IA [Internal Affairs] – He's in charge of IA and other departments, and by enforcing that policy . . . [finding that] pulling of the taser and the entering of the apartment without a warrant[] did not violate any departmental policy, . . . that's fine that that's your policy, but it's unconstitutional. And by virtue of him being the chief . . . that he's enforcing that, then that's where the failure to train comes in . . . .").

In short, the evidence in the record does not come close to showing a municipal policymaker's failure to train or supervise. *See Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) ("[A]t the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate

injury, such that it actually caused the constitutional deprivation." (internal quotation marks omitted)). I grant summary judgment to the Police Defendants on this claim as well.

### E. Official Capacity Claims

In his amended complaint, Mr. Dunbar states that each of the Police Defendants "is sued in his individual and official capacity." ECF No. 67 ¶¶ 9–10, 12–13.[7] Claims against municipal employees in their official capacity are treated as claims against the municipality itself. *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). A municipality may be sued under 42 U.S.C. § 1983 only "when execution of [the] government's policy or custom . . . inflicts the injury." *Monell v. Dep't of Soc. Serv. Of the City of N.Y.*, 436 U.S. 658, 694 (1978). Therefore, a § 1983 claim against a municipal entity must "show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson*, 375 F.3d at 226. While "the plaintiff need not identify an express rule or regulation," he must at least show that a practice "was so persistent or widespread as to constitute a custom or usage with the force of law." *Id.*

The only allegation Mr. Dunbar makes related to a municipal custom or policy is his failure-to-train claim against Defendant Esserman. For the reasons stated above, I granted summary judgment on this claim. Mr. Dunbar does not allege any other policy or custom in the New Haven Police department. So I grant summary judgment to the defendants as to all official capacity claims.

---

[7] The amended complaint does not state whether Defendant Esserman is sued in his individual and/or official capacity. ECF No. 67 ¶ 14.

**F. State Law Claims (Counts One and Two)**

As set forth above, I find that all of Mr. Dunbar's federal claims have failed. 28 U.S.C. § 1367 permits federal courts to exercise supplemental jurisdiction over state law claims "in any civil action of which the district courts have original jurisdiction." Section 1367(c)(3) specifically instructs that district courts "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction." The Second Circuit has counseled that "where, as here, the federal claims are eliminated in the early stages of litigation, courts *should* generally decline to exercise pendent jurisdiction over remaining state law claims." *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006) (emphasis added); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

I have granted summary judgment for defendants on all Mr. Dunbar's federal claims, and no other independent basis for federal court jurisdiction was alleged. While the parties have completed discovery, there is no trial date set. Therefore, under § 1367(c)(3), I decline to exercise supplemental jurisdiction over Mr. Dunbar's state law claims and dismiss them without prejudice to his refiling those claims in state court.

Defendants David Avigdor and Suzanne Avigdor are named in the state law counts only. *See* Am. Compl., ECF No. 67 ¶¶ 15–35. Defendant 1630 Chapel LLC is not named in any counts. Because I dismiss these state law claims, the Private Defendants' motion for summary judgment is denied as moot.

## V.    CONCLUSION

For the reasons set forth above, the Police Defendants' motion for summary judgment, ECF No. 123, is GRANTED as to all Mr. Dunbar's constitutional claims (Counts 3–7). Mr. Dunbar's state law claims (Counts 1–2) are DISMISSED without prejudice. The Private Defendants' motion for summary judgment, ECF No. 126, is DENIED as moot. The Clerk is directed to close this case.

IT IS SO ORDERED.

Dated:       Hartford, Connecticut                          _____/s/_____
              February 11, 2020                              Michael P. Shea, U.S.D.J.